UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DENNIS ZINN, | : | CIVIL NO. **3:04-CV-2025** |
| | : | |
| Plaintiff | : | (Judge Kosik) |
| | : | |
| v. | : | (Magistrate Judge Smyser) |
| | : | |
| JO ANNE B. BARNHART, | : | |
| Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant | : | |

<u>**REPORT AND RECOMMENDATION**</u>

_____The plaintiff has brought this civil action under the authority of 42 U.S.C. § 1631(c) to obtain judicial review of the decision of the Commissioner of Social Security denying the claim of the plaintiff for Social Security supplemental security income.

On September 28, 2000, the plaintiff filed applications for disability insurance benefits and supplemental security income payments, claiming he became disabled on May 31, 1998, due to severe mental impairments of bipolar disorder with extreme depression and panic and anxiety attacks with agoraphobia, as well as coronary artery disease. (TR. 144-56, 157).

His claim was denied initially and on reconsideration. At the plaintiff's request, an ALJ held a hearing on November 13, 2001, and the ALJ issued a decision denying plaintiff's claims on February 20, 2002.  (TR. 100-06).  The plaintiff filed a request for review of the hearing decision and in an August 21, 2002 order, the Appeals Council remanded the case.  (TR. 127, 130-32).  The plaintiff filed subsequent applications for disability insurance benefits and supplemental security income payments on February 27, 2002 (b-1d).  The plaintiff appeared and testified at a hearing held on December 18, 2002 in Harrisburg, PA.  A vocational expert appeared and testified at the hearing.

A second hearing was held before the ALJ on December 18, 2002.  The ALJ again denied the plaintiff's application in a decision dated April 21, 2003.  (TR. 14-26). The plaintiff requested review by the Appeals Council on April 28, 2003.  (TR. 13, 987-88).  The Appeals Council denied the request for review on August 25, 2004.  The plaintiff filed his complaint with this court on September 19, 2004.  (Doc. 1). On November 22, 2004, the defendant filed an answer to the complaint and a copy of the administrative record.  (Doc. 9). Pursuant to Local Rules 83.40.4 and 83.40.5, the plaintiff filed his brief on January 21, 2005, and the defendant filed her brief on February 14, 2005.  (Docs. 13, 15).  The plaintiff

filed a reply brief on February 24, 2005 and the defendant filed the same on March 7, 2005. (Docs. 16, 17).

_____The plaintiff was born on July 29, 1950.  He testified that he dropped out of school in the eighth grade and never obtained his GED or any other training.  (TR. 31, 73).  He acknowledged a history of inability to interact with other people and stated that other people often "picked at" him.  (TR. 73-74).  He stated that he has a short temper and that there have been times where he "would just go off the deep end at people."  (TR. 75).   He was diagnosed with bipolar disorder which causes him to get excited, "all upset" and nervous.  He constantly fears that people are staring at him.  (TR. 38).  He sees Dr. Muneses for counseling and regulation of medication.  (TR. 38).

He testified that he was employed as a janitor between 1995 and 1998.  (TR. 67).  One day in 1998, while he was not taking medicine for his bipolar disorder, he got mad and destroyed property in the garage where he was employed.  (TR. 67).  As a result, he was imprisoned from May 28, 1998 until August 14, 2000.  (TR. 66).  He stated that he has remained on his medication ever since his incarceration.  (TR. 66).

Plaintiff rents a room at a rooming house where he spends the majority of his time sitting and staring out the window because he "can't be around people."  (TR. 32, 76)  He lives by himself and avoids public places such as busses and shopping malls.  (TR. 32,76).  He usually goes to a nearby mission to eat and can go to the grocery store only if someone goes with him.  (TR. 32).  He testified that there is "nothing really" in his life that he cares about.  (TR. 77).  He gave up all major leisure activities and stated that he cannot even maintain focus on television.  (TR. 33).  At the first hearing, he stated that he was able to keep his room neat and organized, but at the time of the second hearing he had been "lacking to keep it clean."  (TR. 78).  He testified that he eats when he is hungry but that a lot of times he just goes without.  There is a communal kitchen where he lives, but he uses it only when no other residents are using it.  (TR. 78).  He allowed his driver's license to expire and stated that he has no desire to have it renewed because he does not think he could drive even if he had a license.  He stated that because of his temper, "somebody would pull out in front of me, I'd probably run them over or something."  (TR. 80).

At the second hearing, the plaintiff stated that he believed that his condition had become worse since the first hearing.  (TR. 27, 69).  He thought that he needed a higher

dosage of medication and indicated that he was experiencing side effects, such as dizziness. (TR. 69). The plaintiff also testified that he had begun hearing voices approximately three months prior to the hearing, and that he continued to hear them "now and then." (TR. 70-71).

The plaintiff also has cardiac problems. He testified that he used to get a lot of pain in his chest and had trouble breathing. (TR. 39). Dr. Nicholson put two stents[1] in the plaintiff's heart. (TR. 39). At the second hearing, he testified that he had gone to the hospital to have another heart catheterization done. (TR. 72). He stated that he still gets very fatigued and out of breath when he walks up or down steps. (TR. 73).

_____The plaintiff also testified that he has problems with his legs. He stated that "they get sore, I get tired when I walk." (TR. 80). He indicated that he could only walk short distances before having to stop and rest. (TR. 81). He also informed the ALJ that he has thoughts of hurting himself "at

---

[1]

. A stent is a thread, rod or catheter, lying within the lumen, the interior space of a tubular structure such as an artery or an intestine, used to provide support during or after the operative union of two structures or to assure potency of an intact but contracted lumen. Spellman's Medical Dictionary, 70, 1034, 1696 (27th Ed. 2000).

times" and that he was hospitalized for five days when he attempted suicide by taking a drug overdose.  (TR. 82-83).

Martin Kester, a vocational expert, also testified at the second hearing.  The ALJ asked the vocational expert whether jobs exist in the national economy for an individual of the plaintiff's age, education, past relevant work experience and a residual functional capacity for light work with limited personal contact with other persons.  (TR. 87).  The vocational expert testified that such a person could perform light, unskilled work as a cleaner (127,200 jobs in the national economy and 3,810 regionally), a food assembler (99,190 jobs in the national economy and 6,500 regionally) or a gate guard/ keeper (38,600 jobs in the national economy and 410 region- ally).  (TR. 88).

The vocational expert testified that the hypothetical person can not perform substantial gainful activity if he has a moderate to severe functioning limitation resulting from mental impairment(s).

The Commissioner initially found in a May 9, 2002 decision that the plaintiff had not lost his ability to work as a janitor.  (TR. 623).  However, the ALJ found that he had. (TR. 23).

In the most recent decision, the ALJ found that the plaintiff retains the residual functional capacity for a limited range of light work.  He determined that the plaintiff maintained the ability to lift and carry 10 pounds frequently and 20 pounds occasionally, sit for 6 hours in an 8 hour workday, stand and walk for about 6 hours in an 8 hour workday, and push and pull as much as he can lift and carry.  (TR. 22).  In addition, the plaintiff needs to avoid working at heights or around moving machinery, needs to avoid temperature extremes and is limited to work involving limited personal contact[2].  (TR. 22).

The plaintiff's appeal presents the questions whether the ALJ erred in finding that the plaintiff suffered from mild to moderate limitations of functioning, rather than moderate to severe; whether the ALJ erred in failing to present all of the plaintiff's limitations as supported by the record when posing a hypothetical question to the vocational expert; whether the ALJ failed to adequately consider the plaintiff's mental

---

[2]

In the first decision dated February 20, 2002, the ALJ specifically acknowledged plaintiff's limitations resulting from his bipolar disorder.  He found that "claimant's capacity for work is reduced by bipolar disorder imposing mild to moderate difficulties interacting with co-workers, supervisors, and the public."  (TR. 105).  In the second decision, the ALJ made no findings regarding plaintiff's bipolar disorder, but did note that he is "limited to work involving limited personal contact."  (TR. 25-26).

impairments; whether the ALJ failed to give proper consider-
ation to the opinions of the plaintiff's treating physicians;
whether the ALJ erred in determining the plaintiff's residual
functional capacity; and whether the ALJ erred in failing to
specify what evidence was credible.

The ALJ found that the objective medical evidence
establishes that the plaintiff has bipolar disorder. Prison
records from 1998 and 1999 show that while the plaintiff was
anxious he was not depressed or psychotic and had reported
feeling better and more stable.  (TR. 248-99).  The ALJ found
that subsequent notes through June of 2000 show that the
claimant continued doing well when compliant with his medica-
tion, that he was not actively suicidal or hallucinating and
that he had no serious side effects or clinical signs or
symptoms.  (TR. 300-71).

The ALJ noted that in December, 2001, Bruce Hershfield,
M.D., had reported that the plaintiff's affect was only
slightly flat, that he denied panic attacks, that he was able
to recall at least a four digit number, and that the plaintiff
reported having friends, being able to follow the plot of a
television program, and being able to prepare a meal.
(TR. 557-69).  At that time, Dr. Hershfield assessed the
plaintiff with "good" and "fair" mental abilities in following

8

work rules, relating to co-workers, dealing with the public, using judgment, interacting with supervisors, dealing with work stresses, functioning independently, maintaining concentration and attention, understanding, remembering and carrying out simple and detailed job instructions and maintaining his personal appearance.  (TR. 566).

The ALJ determined that the plaintiff's mental impairments are severe within the meaning of the Regulations, but determined also that none of the impairments, considered singly or in combination, is (are) of sufficient severity to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 ("Listings").

The ALJ determined that the plaintiff has a residual functional capacity for light work and that his mental impairment requires vocationally that he be in a work environment where there is limited contact with other persons. The Court must review the ALJ's decision regarding the plaintiff's residual functional capacity with the deference required of the substantial evidence standard of review.  *See Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).  As the *Burns* Court stated, "the ALJ nonetheless must have evaluated all relevant evidence.  *Fargnoli v. Massanari,* 247 F.3d 34, 40-41 (3d Cir. 2001), and explained his reasons for rejecting any

such evidence.  *Burnett v. Commissioner of Soc. Sec. Admin.,*
(220 F.3d 112, 122 (3d Cir. 2000).  He also must give
[plaintiff's] subjective complaints 'serious consideration,'
*Mason v. Shalala,* 994 F.2d 1058, 1067 (3d Cir. 1993), and made
specific findings of fact, including credibility, as to
[plaintiff's] residual functional capacity.  *Burnett,* 220 F.3d
at 120; *see also Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir.
1981)." *Id.*

        In *Burnett,* the Court of Appeals for the Third Circuit
stated, "in making a residual functional capacity determina-
tion, the ALJ must consider all evidence before him...although
the ALJ may weigh the credibility of the evidence, he must give
some indication of the evidence which he rejects and his
reason(s) for discounting such evidence... In the absence of
such an indication, the reviewing court cannot tell if
significant probative evidence was not credited or simply
ignored."  220 F.3d 121.  (Internal citations and quotations
omitted).

        In evaluating the plaintiff's residual functional
capacity, the ALJ discussed the medical opinions regarding
plaintiff's mental health.  Under the Commissioner's
regulations, an administrative law judge is required to
evaluate every medical opinion received.  20 C.F.R. §

404.1527(d).  Although he must consider all medical opinions,
the better the explanation a source has provided for an
opinion, particularly through medical signs and laboratory
findings, the more weight [the administrative law judge] is to
give that opinion.  20 C.F.R. § 404.1527(d)(3).  A treating
physician's opinion is to be given more weight if there is
relevant evidence to support the opinion.  20 C.F.R. §
404.1527(d).  The case law provides that while automatic
adoption of the opinion of a treating physician is not
required, [*See Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir.
1991)], a treating physician's opinion is to be afforded great
weight.

         The Court of Appeals for the Third Circuit set forth
the standard for evaluating the opinion of a treating physician
in the case of  *Morales v. Apfel*, 225 F.3d 310  (3rd Cir.
2000).  The Court stated:

> A cardinal principle guiding disability
> eligibility determinations is that the ALJ
> accord treating physicians' reports great
> weight, especially "when their opinions
> reflect expert judgment based on a continuing
> observation of the patient's condition over a
> prolonged period of time." *Plummer* [v.
> *Apfel*, 186 F.3d 422, 429 (3d Cir.1999)]
> (*quoting  Rocco v. Heckler*, 826 F.2d 1348,
> 1350 (3d Cir.1987));  *see also  Adorno v.
> Shalala*, 40 F.3d 43, 47 (3d Cir.1994);
> *Jones*, 954 F.2d at 128;  *Allen v. Bowen*, 881
> F.2d 37, 40-41 (3d Cir.1989);  *Frankenfield
> v. Bowen,* 861 F.2d 405, 408 (3d Cir.1988);
> *Brewster,* 786 F.2d at 585.  Where, as here,

> the opinion of a treating physician conflicts
> with that of a non-treating, non-examining
> physician, the ALJ may choose whom to credit
> but "cannot reject evidence for no reason or
> for the wrong reason."  *Plummer*, 186 F.3d at
> 429 (*citing  Mason v. Shalala*, 994 F.2d 1058,
> 1066 (3d Cir.1993)).  The ALJ must consider
> the medical findings that support a treating
> physician's opinion that the claimant is
> disabled. *See  Adorno*, 40 F.3d at 48.  In
> choosing to reject the treating physician's
> assessment, an ALJ may not make "speculative
> inferences from medical reports" and may
> reject "a treating physician's opinion
> outright only on the basis of contradictory
> medical evidence" and not due to his or her
> own credibility judgments, speculation or lay
> opinion.  *Plummer*, 186 F.3d at 429;
> *Frankenfield v.  Bowen*, 861 F.2d 405, 408 (3d
> Cir.1988);  *Kent*, 710 F.2d at 115.

*Id.* at 317-318.


The social security regulations state that when the

opinion of a treating physician is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in your

case record," it is to be given controlling weight. 20 C.F.R.

§416.927(d)(2).  When the opinion of a treating physician is

not given controlling weight, the length of the treatment

relationship and the frequency of examination must be

considered.  The Regulations state:

> Generally, the longer a treating source has
> treated you and the more times you have
> been seen by a treating source, the more
> weight we will give to the source's medical
> opinion. When the treating source has seen
> you a number of times and long enough to

> have obtained a longitudinal picture of
> your impairment, we will give the source's
> opinion more weight than we would give it
> if it were from a nontreating source.

20 C.F.R. §416.927(d)(2)(I). Additionally, the nature and

extent of the treatment relationship is considered. The

Regulations state:

> Generally, the more knowledge a treating
> source has about your impairment(s) the
> more weight we will give to the source's
> medical opinion. We will look at the
> treatment the source has provided and at
> the kinds and extent of examinations and
> testing the source has performed or ordered
> from specialists and independent
> laboratories. For example, if your
> ophthalmologist notices that you have
> complained of neck pain during your eye
> examinations, we will consider his or her
> opinion with respect to your neck pain, but
> we will give it less weight than that of
> another physician who has treated you for
> the neck pain. When the treating source has
> reasonable knowledge of your impairment(s),
> we will give the source's opinion more
> weight than we would give it if it were
> from a nontreating source.

20 C.F.R. §416.927(d)(2)(ii).


Plaintiff argues that the ALJ erroneously rejected the

treating physician's opinions, including global assessment of

functioning scores assigned by treating physicians, and that he

failed to adequately explain the rejection.


The ALJ awarded little weight to GAF scores of 25-45

"since they were inconsistent with the clinical findings as

well as the fact that the plaintiff was stable with medication." (TR. 22). The fact that the plaintiff was stable with medication is significant because an impairment that is controllable or amenable to treatment does not support a finding of disability. *See Kisling v.Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997). On September 18, 2000, Dr. Muneses, a treating physician, indicated that plaintiff had labile mood swings, poor concentration and poor judgment. Dr. Muneses noted, however, that these things occur when the plaintiff is not taking his medications. (TR. 526).

When the plaintiff was released from prison in 2000, his GAF was assessed at 35, indicating a severe limitation in functioning. In March of 2001, his GAF had increased to 55, which indicates a moderate difficulty in social, occupational or school functioning. Diagnostic and Statistical Manual of Mental Disorders, 32 (4th Ed. 1994). In June, 2001, Dr. Muneses completed an assessment indicating that the plaintiff had poor mental abilities dealing with normal work stress, remembering work like procedures, understanding and remembering simple instructions, maintaining attention for two hour segments, maintaining regular attendance, completing a normal workday, accepting instructions and responding appropriately. (TR. 585-86). The ALJ found that this assessment understated the plaintiff's abilities as supported by the medical evidence

as a whole as well as the limited treatment history.  The ALJ
also accorded this assessment little weight.   We view this as
an inadequately explained rejection of probative diagnostic
information from a treating physician.

     The ALJ noted that in November, 2000, a state agency
psychological consultant had concluded that the plaintiff was
capable of simple routine work, although not around large
groups of people.  (TR. 388-91).   The ALJ found that this state
agency psychological consultant's opinion was supported by the
examination reports.   The ALJ gave the opinion significant
weight.  (TR. 22).   The ALJ also afforded significant weight to
Dr. Hershfield's mental assessment, which shows that the
plaintiff had fair and good mental abilities in performing work
related tasks[3].  (TR. 22).   The ALJ gave significant weight to

---

[3]

     Following the plaintiff's discharge from the hospital
after an overdose, Dr. Hershfield performed a psychiatric
evaluation.  (TR.559-69).  Dr. Hershfield reported that the
plaintiff was pleasant and cooperative throughout his
evaluation.  He was appropriately dressed for the occasion
and the weather.  Dr. Hershfield found nothing unusual about
the plaintiff's manner, hygiene, gait or posture.  (TR. 559-
60).  Dr. Hershfield reported there was no problem in
plaintiff's social judgment (TR. 563).  He determined that
the plaintiff's anxiety level did not "markedly" shift during
the interview and he denied having panic attacks.  (TR. 561).
His affect was "slightly" flat and he reacted appropriately.
He denied any hallucinations and answered questions in a goal
-directed, relevant manner and he gave no indication of
having a thought disorder such as looseness of associations.
(TR. 562).  Dr. Hershfield completed a questionnaire wherein
he indicated that the plaintiff was seriously limited, but
not precluded from making occupational, performance and

Dr. Fischetto's GAF of 51, citing "examination findings" and "treatment history."  (TR. 22, 592-98, 966-72).

We view the assignment of greater weight to non-examining and one-time examining agency doctors' reports than to a treating physician's report as not consistent with *Morales v. Apfel, supra*.

The plaintiff argues that the ALJ accepted evidence favorable to the outcome of denying his application and rejected evidence of a moderate to severe mental impairment without sound reason(s).

The ALJ found that the plaintiff retains the RFC for a limited range of light work.  He determined that plaintiff has the ability to lift and carry 10 pounds frequently and 20 pounds occasionally, sit for about 6 hours in an 8 hour workday, stand or walk for about 6 hours in an 8 hour workday and push and pull as much as he can lift or carry.  In addition, the ALJ determined that plaintiff needs to avoid working at heights or around moving machinery and needs to avoid temperature extremes.  (TR. 22).  The plaintiff argues that the "second decision makes no finding at all in regard to [plaintiff's] mental impairment."  (Doc. 13, p. 8).  In his

personal-social adjustments.  (TR. 566-68).

residual functional capacity assessment the ALJ found that the plaintiff is limited to work involving limited personal contact with others.  (TR. 22).  The plaintiff's assertion is that this fails to adequately describe the functional effect of the plaintiff's social phobias.

The record contains evidence of a severe mental impairment.  The ALJ found the plaintiff's mental impairment to be severe, but determined that it does not preclude the plaintiff from performing light work if he has limited personal contact with other persons.

The plaintiff had proven to the ALJ's satisfaction that he can not work as a janitor, a job involving limited contact with other persons.  The ALJ states that the finding of an inability to perform past work is a residual functional (exertional) capacity based determination.  (TR. 23).  The ALJ lowered the exertional ability of the plaintiff to light, and finds that it is proven that he can do light work.  The plaintiff's loss of his past work as a janitor did not have to do with exertional limitations; he lost his job due to a violent emotional outbreak.  The ALJ's analysis does not address the plaintiff's social phobia as a work-related factor in a full and direct manner.  In occupational adjustment ratings, TR. 597, the plaintiff's ratings are mostly "Poor."

17

While it may not be consistent with the plaintiff's mental impairment theory that he committed a reprehensible violent crime that got him fired from his last job, it is important not to avoid the occupational adjustment issue by characterizing the case as one involving exertional capacity issues.

The residual functional capacity limitation determined by the ALJ that addresses the mental social interaction problems of the plaintiff is that the job must be one where the work involves limited personal contact.  Assuming that his mental impairment(s) reduce to a vocational factor accurately so described, he can work.  TR. 87-88.

In a finding as to a critical piece of evidence, the ALJ stated:

> The record also contains a June 2001 assessment showing that the claimant had poor mental abilities in dealing with normal work stress, remembering work like procedures, understanding and remembering simple instructions, maintaining attention for two hour segments, maintaining regular attendance, completing a normal workday, and accepting instructions and responding appropriately (Exhibits 20F, 23F and B-24F); however, I find that this assessment understates the claimant's abilities as supported by the medical record as a whole as well as the limited treatment history. Therefore, this assessment has been accorded little weight.

TR. 22.  No reason at all is stated for this finding.

We have studied this transcript and fail to see how this claimant could reasonably be evaluated as someone able to perform substantial gainful activity.  We can not find there to be substantial evidence to support a finding that his severe mental impairment's work place manifestations are addressed satisfactorily by "limited personal contact with others."  We fail to see how the ALJ could reasonably conclude that the Commissioner had proven that he has the residual functional capacity to work.

There is not substantial evidence to support a finding that the plaintiff's mental impairment has no more than a mild to moderate effect on his ability to function in a job setting. There is not a correlation based upon substantial evidence for the finding and conclusion that the plaintiff's mental impairment does not preclude his ability to perform substantial gainful activity beyond the impediment to doing so that would be eliminated by placing him in a work environment where he has only limited personal contact with others.

The plaintiff argues that the ALJ failed to present enough particulars about the plaintiff's limitations to the vocational expert.  The ALJ presented essentially two hypothetical persons.  One is limited to work involving limited personal contact with others.  TR. 87.  The other has a

moderate to severe mental impairment.  TR. 88.  The first can
perform substantial gainful activity, the vocational expert
said, while the second can not.  TR. 87-88.  The ALJ found that
the plaintiff's mental impairment is severe, but not so severe
as to prevent him from performing substantial gainful activity.
The plaintiff argues that the evidence more forcefully supports
a finding that the severe mental impairment results in moderate
to severe limitations on his ability to perform substantial
gainful activity than it does a finding that he is limited to
work involving limited contact with other persons.  We find no
inherent error in the questions to the vocational expert.  But
if the Commissioner was content to describe the plaintiff's
limitations and problems no more particularly than either
"limited personal contact with others" or "moderate to severe,"
then the Commissioner must show here that she has carried the
burden of proving that the plaintiff's limitations are not
moderate to severe.

     The plaintiff argues in separate arguments that the ALJ
failed to adequately consider the plaintiff's mental
impairments and failed to give adequate consideration to the
opinions of his treating physicians.  We believe that a
determination here that Mr. Zinn has a mild mental impairment
is clearly outside the zone of reasonable findings.  The ALJ's
analysis of the plaintiff's mental condition does not stay

focused upon that subject matter.  It does not stay on track.
Without explanation, in the course of a discussion of the
mental impairment, the text of the decision abruptly turns to a
focus on the heart condition, noting favorable reports relating
to the plaintiff's heart condition, TR. 20, as though a
person's good exercise tolerance were a factor mitigating the
otherwise apparent seriousness of his social phobia.  The
Commissioner needs to reconsider whether and why this
claimant's mental impairment is not moderate to severe.

The plaintiff argues that the residual functional
capacity determination was erroneously determined and stated.
The translation of the severe mental impairment of the
plaintiff into a vocational limitation to work involving
limited interaction with other persons does not adequately
account for the severity and functional effects of the mental
impairment.  The ALJ's residual functional capacity
determination is based upon his finding of less than entire
credibility on the part of the plaintiff.

The ALJ noted:

The claimant testified and stated in the record
that he has feelings of depression, anxiety and
paranoia, difficulty getting along with others
and going out in public, problems coping with
everyday problems, difficulty making decisions
on his own, feelings that people are looking at
him, and an inability to start and complete

                    projects or understand instructions and carry
                    them out.  He also alleges frequent crying,
                    fatigue, shortness of breath, dizziness,
                    difficulty lifting more than 10 pounds at a
                    time, loss of interest in usual activities, and
                    difficulty performing activities of daily
                    living such as personal care, driving and
                    shopping.

TR. 19.  He decided to give "only limited weight" to the

plaintiff's testimony and to the global assessments of

functioning in the 25 to 45 range, TR. 22, and to give

significant weight to Dr. Fischetto's global assessment of

functioning of 51.  TR. 22.  In this evaluation of the

plaintiff's reporting of his symptoms, the ALJ found the

plaintiff to be not entirely credible.  TR. 20, 22, 24.


          The standard of "entire credibility" or "total

credibility" is not supported in the regulations or the

statute.  A fact finder must evaluate testimonial assertions of

the witness with a consideration of the materiality of the

assertion, the truth of the testimony and the possible

reason(s), if any, for why the testimony is not consistent with

other evidence and whether untruthful testimony is the result

of intentional misrepresentation or a mistaken or involuntary

lack of accuracy.


          Rejection of a disability application of a mentally

impaired and apparently unfocused person such as Mr. Zinn on

grounds of less-than-entire credibility requires a great deal more explanation than is given to it by the ALJ.  We are not able to understand the connotations of credibility as used here by the ALJ to discount the plaintiff's "feelings of depression, anxiety and paranoia, difficulty getting along with others and going out in public, problems coping with everyday problems, difficulty making decisions on his own, feelings that people are looking at him, and an inability to start and complete projects or understand instructions and carry them out."
TR. 19.  The range of GAF scores and the correlation between lower degrees of symptoms and adherence to a medications regimen do not in our view constitute substantial evidence to carry the Commissioner's burden of proving a capacity to perform work other than his past janitorial work.

    It is recommended that this can be remanded to the Commissioner for further consideration of whether the plaintiff has a moderate to severe mental impairment.


                                        **_/s/ J. Andrew Smyser_**
                                        J. Andrew Smyser
                                        Magistrate Judge
Dated:   April 14, 2005.

23